# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                                         )
           v.                     ) Docket No.:  20-cr-10200-FDS
                                         )
WAQAS ALI                           )

## SENTENCING MEMORANDUM ON BEHALF OF WAQAS ALI

### I.    Introduction

Waqas Ali comes before this court deeply ashamed and taking full responsibility for his conduct. His story is not a straightforward embezzlement simply explained by pure greed. Like many theft cases, it began as a criminally opportunistic decision amidst financial struggles – as an employee of Bank of America (BOA), one of the business portfolios he serviced belonged to the company of an "angel investor". As so often occurs, Mr. Ali's thefts spiraled out of control. His family's – particularly his father's – esteem for him was long a personal sore spot for Mr. Ali, and they seemed to think more of him the more successful he appeared with nice things. That momentary positivity in a strained relationship played a role in keeping his conscience at bay for a time. He also struggled emotionally at that time with the weight of his young son's autism diagnosis and spending money on consumer goods gave some fleeting emotional lift from anxiety and reality. In the end, he accepted how out of control the embezzlement became, and stopped taking money after almost 10 months and $600,000. His employer and the client discovered the thefts roughly one year later. When asked to

take part in an interview with BOA investigators in September 2018, he appeared with a retained attorney and admitted to his thefts, offering explanation but not excuse. It would be nearly two years before federal agents arrested him at his home. Approximately 1 month after his arrest, he entered his guilty pleas in this case.

Because of the unique circumstances of this case and his thorough remorse, Mr. Ali asks the court to impose a sentence of "time served"[1] followed by a three year period of supervised release which includes a suggested period of at least 6 moths of home confinement and restitution as agreed in the plea agreement.

## II.    Waqas Ali's Background

Mr. Ali is the son of Pakistani immigrants – his parents brought him to the United States as a toddler and his family later all became naturalized citizens. His father was born in a village in Pakistan with little to no formal education beyond hard work. His mother received education perhaps through high school, but the family dynamic was one of a traditional Pakistani household. That is, his father maintained a dominant role in the household while his mother was a homemaker. Their union was an arranged marriage. Mr. Ali described the dynamic in the presentence interview as his father running the show – it was his way or no way – while poignantly describing his mother as a very calm person who, "didn't live a life that anyone deserves." Mr. Ali recalls that

---

[1] On August 19, 2021, Magistrate Judge Dein issued an arrest warrant on a complaint in this case. [Dkt. 4]. Agents arrested Mr. Ali the following morning and after an initial appearance, the court released Mr. Ali on conditions. [Dkt. 9].

his father favored his siblings over himself, while his mother favored Mr. Ali and his sister.

The dominance of the household by Mr. Ali's father went hand in hand with his father's harbored resentments as well. Mr. Ali recalls the profound antipathy that his father had for his maternal uncle – a veterinarian in Billerica whom Mr. Ali described as a second father – when his uncle would help the family financially or even just with advice. Mr. Ali's father supported the family of 5 with only a job as a security guard at Harvard University. Unable to maintain the family apartment in Revere, Mr. Ali's father had to move the family into the uncle's house while on a waitlist for a low-income apartment in Cambridge to become available. One childhood episode in particular left an impression on young Mr. Ali and encapsulates the dynamic: his uncle had gifted him a Gameboy color, about $300 at the time around the holidays. Mr. Ali recalls playing on the device outside on a porch and telling his brother how great his uncle was for giving it to him. Mr. Ali's father overheard the discussion and made Mr. Ali sit outside in the winter wearing a tank-top and shorts in resentment for Mr. Ali's praise of his uncle.

Regarding his relationship with his father, Mr. Ali described in the presentence interview, "I wish it was more physical abuse, than the mental abuse, to this day. Talking to him, I always get these butterflies in my stomach, because I don't know what I might say that will get him upset and I'll go on a silent treatment for another six months."

3

Mr. Ali's own arranged marriage followed his mother's tragic Hepatitis C diagnosis when Mr. Ali was around 20 years-old. Her health outlook seemed grim as she waited on a liver transplant list. His sister had recently fled the house leaving only a note to move in with a non-Muslim Hispanic man, creating a strained household environment. For his part, Mr. Ali had not taken education seriously his senior year in high school, and instead spent two years at Middlesex Community College. Mr. Ali's mother wanted to see him married, fearing her prognosis would mean she would not do so before she died.[2] In 2010, just shy of his 21st birthday, Mr. Ali got married after his parents arranged a match. At the time, his wife was only 17 years-old and lived in Pakistan. Though the age difference bothered Mr. Ali at the time, Mr. Ali's father thought the arrangement was a perfect fit – her family was well-off and well-educated and her father was an accomplished cricket player, almost making the Pakistani national team. Not wanting to disappoint his parents, Mr. Ali agreed to be married.

He now describes his wife as his "rock", but the marriage struggled early. Mr. Ali candidly admits that he was still living his youthful 20's, while his wife tried to live a married life. They resided with his family in a Cambridge low-income apartment at the time. Mr. Ali worked at BOA and part-time security at Harvard and his wife worked and attended school. They were told that once children came, marriage would

---

[2] Mr. Ali's mother ultimately passed in June 2015.

be easier. In May 2014, Mr. Ali's wife gave birth to the couple's oldest son, Minor 1[3].
Sometime thereafter, Mr. Ali and his wife and son fled the family apartment in a similar
manner to Mr. Ali's sister – without notice.

The couple moved out because his family treated his wife and son poorly –
though his brother was not working at the time, the family would feel it a burden to
watch the couple's son while Mr. Ali worked or his wife worked or attended school. His
father became mentally abusive toward his wife – she would come home from work or
school late at night, and his father still told her that she needed to do the dishes or clean,
true to his traditional upbringing. If Mr. Ali stood up to his father on her behalf, "that
was a problem." The couple fled in their leased car (which Mr. Ali's father ultimately
repossessed) with $100-500 to their name. Relying on friends for help, Mr. Ali's wife
skipped class to work more to save money. In the aftermath, Mr. Ali's family would say
that he and his wife were "ungrateful" and accused his wife of "brainwashing" Mr. Ali,
though it was ultimately his determination to leave the apartment.

Not long after, when Minor 1 was 1 year old, the doctors told the couple that
Minor 1 was autistic. Following the diagnosis, they struggled with understanding the
condition and finding services. Not long after, still struggling with how to help Minor 1,
Mr. Ali and his wife sent Minor 1 to Pakistan at the suggestion of Mr. Ali's mother-in-
law. She had recommended a school there for "holistic" and "herbal" approaches to

---

[3] Mr. Ali's sons are referred to in this memorandum as "Minor 1" and "Minor 2". Their
names are identified in the presentence report in the section labeled
"Marital/Children".

helping Minor 1's development. As explained by Mr. Ali in the BOA interview, his mother-in-law convinced them that through a combination of religion and modern science, Minor 1 could start walking, talking, and living a normal life. The school allowed for personal loans to cover costly tuition; ultimately the overseas transfers of some $54,000 from the victim accounts went to Mr. Ali's mother-in-law pay a tuition loan. Sometime in 2017, after approximately 9 months in Pakistan, Minor 1 returned to the United States, though still non-verbal and unable to walk.

Ultimately, Mr. Ali and his wife purchased their current suburban home. Minor 1 continued to be unable to communicate and struggled developmentally. The couple learned from a neighbor that there were advocates for children like Minor 1, which ultimately enabled them to find a program some 1 hour away from their residence. Mr. Ali admitted to BOA investigators that during this period, if he or his wife wanted something for themselves or Minor 1, he purchased it, admittedly shopping at places he shouldn't have with money he shouldn't have been using. Mr. Ali continued, telling investigators that when his wife would ask where the money came from, he would explain that his bonuses were good. During this uneasy time filled with worry for Minor 1's future, Mr. Ali experienced some fleeting psychological fulfillment – albeit terribly misplaced – by feeling like he was giving his family a normal life, though he knew better. Eventually, reality sunk in about how out of control the spending had become, how badly this would end for himself and his family, and Mr. Ali stopped the embezzlement.

During the period when he appeared to have money, Mr. Ali found that his family valued him more than before. He explained to probation, "When I had money, they were all close with me." In the aftermath of coming to his senses and ending the thefts in the summer of 2017, his relationship with his father returned to the cold and difficult days of his youth.

Mr. Ali's thefts ended in July 2017 but were not definitively discovered until sometime around his interviews with BOA investigators in September 2018. Mr. Ali had been placed on administrative leave and retained counsel. In the interview, with his retained counsel, he admitted to BOA representatives that he had stolen from the client's accounts. It would be nearly two years before these criminal charges issued. In the interim, his wife assumed responsibility for the family finances (which continues to the present) while Mr. Ali has primarily cared for their son Minor 1, and a second son, Minor 2, born in September 2019.

At the time of the presentence interview, Minor 2's doctors were concerned at developmental delays possibly leading to a diagnosis of autism for him as well. One study from Kaiser Permanente found that the risk of younger siblings developing an autism spectrum disorder is 14 times higher if an older sibling has ASD.[4] Since the PSR interview, Minor 2's doctors have definitively diagnosed him as also having autism and requiring monitoring and early interventions.

---

[4] See "Risk of Autism in Younger Children Increases Significantly If They Have an Older Sibling with Disorder", available at https://www.kp-scalresearch.org/risk-for-autism-in-younger-children-increases-significantly-if-they-have-older-sibling-with-disorder/ (Last accessed April 27, 2021).

Because Minor 1's development delays are so profound and his condition is such a central component to Mr. Ali's family life, investigators with the Federal Defender Office spent significant time interviewing Mr. Ali and his wife as part of a sentencing video. The video, submitted as Exhibit A and under seal due to its depictions of the minors, was not designed to engender unwarranted sympathy for Mr. Ali at sentencing – indeed, Mr. Ali and his wife were concerned that the video not unfairly use Minor 1 as some sort of a prop or be interpreted as an attempt to avoid punishment or responsibility. Rather, Exhibit A is submitted by Mr. Ali's counsel because it allows for the best understanding of Minor 1's functioning and condition as it relates to the sentencing issues and imposition of a just sentence in this case. Mr. Ali is clear-sighted in understanding that nothing can excuse or justify his thefts and failings in this case. Mr. Ali knows that responsibility for his offenses is his alone and is prepared to accept a just sentence in this case.

As explained by Mr. Ali and his wife in Exhibit A – Minor 1 is almost 7 years old and still struggles with forming words; beyond struggles with speech, he cannot express his basic needs, including the need to use the bathroom, despite attempts at different strategies to do so. Consequently, Minor 1 still wears a diaper. As seen in the video, at six and almost seven years old, he struggles in climbing simple playground equipment as a toddler would. The couple explains that routines are critical to children like Minor 1. He currently travels 2 hours round-trip to attend a special needs school, which requires him to leave on a bus around 8:00 AM daily. Mr. Ali wakes his son up, as his wife is already out of the house by that point for her responsibilities. Minor 1

refuses to leave house for the bus unless with Mr. Ali – his wife explained that Minor 1 will kick and punch when she has had to bring him. After school, Minor 1 will eat a meal because he won't eat much without Mr. Ali, and consequently he doesn't eat much at school. With the school closed for a period during the pandemic, Minor 1 severely regressed in even his minimal skills with just 30 minutes of remote learning; during that time; even the basic skills of asking for water, and communicating a dirty diaper regressed. It took some months after school reopened for Minor 1 to make up the lost time and return to his pre-pandemic functioning.

Because of concerns that the children can't adequately communicate health concerns, Mr. Ali and his family have been largely home-bound during the pandemic. Though the PSR accurately recounts that Mr. Ali has no mental health diagnosis, he would likely benefit from therapy as a means to process his upbringing and family issues, his sons' diagnoses[5], and feelings of self-worth from these offenses and the effects his actions have caused.

Currently, the household is primarily sustained by Mr. Ali's wife working while also studying for an advanced degree, and Mr. Ali's more modest contribution from weekend work at Apple. More important than this monetary contribution to the

---

[5] See "Autism Speaks: Parent's Guide to Autism" at 7, "Taking Care of Yourself", available at: https://www.autismspeaks.org/sites/default/files/2018-08/Parents%20Guide%20to%20Autism.pdf (Last Accessed April 27, 2021)("Caring for a child with autism can be physically exhausting and emotionally draining. Parenting responsibilities can create extraordinary stress. Trying to balance your time and energy with the needs of your other children, the needs of your marriage and your own personal needs is not easy.")

household, Mr. Ali is able to provide daily care for Minor 2 in the home. Mr. Ali's

absence during a period of incarceration will risk insolvency for the family and likely

loss of the family home. Without Mr. Ali's presence, costly and specialized childcare

would upend the family's financial picture.

### III.    Offense Conduct

Mr. Ali's conduct – though involving a significant amount of money – was

largely accomplished by transferring more money than requested between company

accounts of the victim company and withdrawing or utilizing cashier's checks to take

money from the account. It involved only one of the companies for which BOA had

assigned to Mr. Ali assist on. His conduct was relatively brief in duration compared

with many embezzlement cases and ended of his own accord before the thefts were

uncovered. Upon discovery, he submitted voluntarily to an interview with BOA

investigators and admitted his conduct. Ultimately, BOA assumed the loss rather than

the victim company.

### IV.    The Requested Sentence is Supported by the Factors Under 18 U.S.C. § 3553(a)

Mr. Ali respectfully requests that this court impose a term of incarceration of

"time served" to be followed by 36 months of supervised release which includes at least

6 months of home confinement and restitution according to the Rule 11 agreement.

Such sentence is "sufficient but not greater than necessary" to comply with the

purposes of sentencing.

### a.    Nature and Circumstances of the Offense and History and Characteristics of Mr. Ali

Mr. Ali's conduct caused personal enrichment and ultimately a loss to Bank of America of $600,000.[6] The funds were taken from an investment account and credit line from one company and did not, under the Guidelines, involve sophisticated means or substantial financial hardship or vulnerable victims. Mr. Ali's background suggests that the circumstances of these offenses are not easily explained as simple greed.

Regarding the history and characteristics of Mr. Ali personally, Mr. Ali's embezzlement is an aberration and occurred during a 10-month period during his mid-twenties. He has no other criminal history. He and his wife have a strong relationship, owing to the support of Mr. Ali's wife despite what she described to probation as disbelief that he was so foolish and didn't think of their family during the thefts. Mr. Ali expresses genuine remorse clearly realizes that it is his fault that this situation has occurred. His wife now controls the family finances and Mr. Ali presents with no concerns for substance use. Despite the thefts, Mr. Ali has a long-term employment history and there is reason to believe that he will be able to obtain appropriate and significant employment in the future. Mr. Ali has been compliant with his conditions of release, and there is every empirical reason to believe he would successfully comply with any conditions the court requires as part of a just sentence.

### b.  Kinds of Sentences Available

---

[6] According to media reports, in 2018 Bank of America ended FY 2018 with gross profits of $91.02 billion. See "Bank of America Gross Profit 2006-2021" available at https://www.macrotrends.net/stocks/charts/BAC/bank-of-america/gross-profit (Last accessed April 30, 2021).

A sentence must address the "kinds of sentencing available" and the requirement to provide 'needed educational or vocational training....in the most effective manner." With the pandemic ongoing it remains unclear what, if any, programming will be available to Mr. Ali if sentenced to a period of incarceration.

A sentence of incarceration in Mr. Ali's case will impose needlessly harsh conditions when considered against his rare and unique caretaking responsibilities and criminal conduct here. Mr. Ali's oldest son, Minor 1, relies on Mr. Ali for stability and routine. Mr. Ali's case is set apart from other defendants with caretaking responsibilities because without Mr. Ali's presence his son's limited functioning will clearly regress profoundly. Minor 1's daily routine is critical to the small steps in his development over time; even something as seemingly simple as his mother rather than Mr. Ali getting Minor 1 to the bus results in trauma and physical reactions by Minor 1 against his mom. Mr. Ali's role is simply not replaceable. And Minor 1 is not alone in reliance on Mr. Ali's caretaking – Mr. Ali's second son Minor 2 requires early intervention himself in the face of his own diagnosis. Without Mr. Ali, the family would be unable to sustain costly and specialized care for Minor 2.

Incarceration would impose harsh conditions upon the blameless children and would result in harsh conditions for Mr. Ali as well – such an incarceration would be dominated by anxiety and worry beyond what would normally attend a prison sentence. Even if visitation were allowed by a facility, it would be impractical given the effect such visitation this would have on Minor 1 and Minor 2. Harsher conditions are a

valid consideration in deciding whether to impose a shorter sentence. See United States v. Spano, 476 F.3d 476, 479 (7th Cir. 2007).

Consideration of the types of sentences available to the court would justify the requested sentence here. Even a short sentence of incarceration will be critically disruptive and harsh. It jeopardizes Minor 1 and Minor 2's development and will put the family in danger of foreclosure. When considered against other options, a sufficient sentence in this case can be achieved without incarceration. The court can adequately punish Mr. Ali by requiring a significant period of home incarceration as a condition of supervision[7]. Home incarceration in order to provide continuity for Mr. Ali's sons would be appropriate under these rare circumstances and no light touch for Mr. Ali.

### c.   Deterrence and "Just Punishment"

A prison sentence of even minimal length is not necessary to deter Mr. Ali from further criminal activity. He has internalized the wrongfulness of his conduct. Deterrence for Mr. Ali from committing new criminal conduct comes directly from the guilt and anxiety he continues to feel for acting so foolishly and risking his family's well-being.

Likewise, the requested sentence will adequately deter anyone in similar circumstances. Any person considering offending in a similar way would see in this

---

[7] Mr. Ali's suggests at least six months of home confinement as sufficient but not greater than necessary, but certainly the court has the authority to impose a longer period of home confinement. Mr. Ali, through counsel, suggests six months as a balance between punishment and enabling employment consistent with his caretaking responsibilities at some point in the nearer future to enable effective progress towards restitution during the period of supervised release.

sentence as deterrence in Mr. Ali's prosecution, loss of employment, embarrassment, and dishonoring of his responsibilities to his family.

The First Circuit recognized that jail time is not necessarily the only factor when evaluating deterrence in cases with high financial loss. Judge Stearns, in imposing a sentence that did not include imprisonment, explained why the sentence satisfied the criteria of deterrence:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

See United States v. Prosperi, 686 F.3d 32, 48 (1st Cir. 2012) (Mr. Prosperi received a probationary sentence with 6 month home confinement and 1,000 hours of community service with a guideline range of 87-108 months as part of a $5.2 million, 9 year-long conspiracy and mail fraud scheme related to knowingly providing sub-standard concrete for the "Big Dig" project). As attested to by his statements to BOA investigators and in the presentence report, Mr. Ali has experienced a significant amount of anguish having been called into account.

The Supreme Court also recognized that imposing a term of incarceration in the name of promoting respect for the law in a case where a particular defendant's unique circumstances suggest a more lenient sentencing alternative actually could promote *disrespect* for the law:

> Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may

14

work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id.*

The requested sentence here is a significant punishment for this defendant. This sentence will not mean that Mr. Ali simply moves on from his offense, or just relaxes at home for a time. Home confinement for Mr. Ali would mean that Mr. Ali can provide stability to give his sons' room for development, but also that he will not have respite from the inherent stress described the Autism foundation. Denial of even the simple ability to go for a walk for a moment alone outside of the stressful environment is significant in these circumstances. For a period of years, he will be continually reminded of his failings in this case. Mr. Ali knows that if he fails to comport with the requirements of supervision, he will return to court, and jail will be a likely consequence. All the considerations attendant to this requested sentence would result in just punishment under these individual circumstances.

### d. Unwarranted Sentence Disparity

The requested disposition would be in line with the sentencing practices of this district for fraud/embezzlement/theft cases, and is justified in comparison to sentences in embezzlement and fraud cases involving substantially larger loss amounts over significantly longer periods of time. Any arguable disparity would be justified by the unique circumstances of Mr. Ali's irreplaceable caretaking responsibilities. See United States v. Glen Dias, 09-cr-40034-FDS (18 months incarceration for conspiracy, fraud and money laundering part of 6 year scheme involving roughly $1.1m net gain to defendant after he stole equipment and parts from employer); United States v. Andy Kim, 15-cr-

10371-FDS (18 months incarceration for wire fraud where controller of Cambridge software company directed $1m ultimately to his own accounts through a separate real estate company in two separate transactions and created paperwork appearing to make the dispersals from employer to company's owner); United States v. Palestine Ace, 17-cr-10120-ADB (12 months and 1 day for 5 year embezzlement scheme involving some $2.7m loss calculation and substantial enrichment to defendant which affected work and reputation of eight different Boston non-profits); United States v. William McCullough, 15-cr-40036-DHH (12 months and 1 day for 5 year embezzlement scheme whereby $12m in corporate income of payroll company deposited into "slush fund", which defendant owner then wrote some $1.7m in checks to himself, including thefts from accounts which held client funds in trust); United States v. Christine Mordach, 14-cr-10218-PBS (12 months and 1 day for Financial Aid Director at Merrimack College who perpetrated 13 year fraud scheme whereby she took out fraudulent student loans without knowledge of students, totaling some $4.3m in loss calculation); United States v. Ross McClellan, 16-cr-10094-LTS (18 months after trial for former executive vice president at State Street who operated hidden commission scheme involving institutional investors, including government employee pension funds, with losses exceeding $20m); United States v. William Dunn, 12-cr-10224-DPW (probation for conspiracy charge involving fraudulent statements in mortgage applications which included recruiting potential purchasers, assisting in falsifying loan documents, and providing false employment verifications to mortgage companies over a period of months which yielded guideline range of 37-46 months); also United States v. Jose

Spinola, 20-cr-10115-RWZ (probation for tax preparer who created fictitious deductions for taxpayers without their consent during three year period, which practices increased his business and resulted in a tax loss of some $344,000).

## V.    Conclusion

After an overall balancing of the 3553(a) factors, the Court has ample support to impose the requested sentence, one which imposes punishment and community confinement that accounts for the rare circumstances of this case. As the First Circuit stated in United States v. Rodriguez:

> In the final analysis, then, the gloss supplied by *Kimbrough* signifies that a district court should not evaluate a request for a variant sentence piecemeal, examining each section 3553(a) factor in isolation, but *should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.* This inquiry should be guided by, but not made unflinchingly subservient to, the concerns expressed in the statute's various sub-parts.

United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008)(emphasis added), citing Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007).

Here, when the Court considers all the relevant factors as a group, a sentence of "time served" followed by a three year period of supervised release which includes a suggested period of at least 6 moths of home confinement and restitution as agreed in the plea agreement is logical, practical, and supported; it is sufficient but not greater than necessary to achieve the goals of sentencing. For this individual, at this moment in time, this sentence is just.

Respectfully submitted,

WAQAS ALI
By his Attorney,

*/s/ Brendan Kelley*
Brendan Kelley
  B.B.O.: 569054
Assistant Federal Public Defender
Federal Public Defender Office
P.O. Box 51268
Boston, MA  02205
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 30, 2021.

*/s/ Brendan Kelley*
Brendan Kelley